J-S46013-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| BRANDON RICHARD WELLS | : | |
| | : | |
| Appellant | : | No. 157 WDA 2024 |

Appeal from the Judgment of Sentence Entered September 19, 2023
In the Court of Common Pleas of Venango County Criminal Division at
No(s): CP-61-CR-0000297-2022

BEFORE: LAZARUS, P.J., BOWES, J., and KING, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED: FEBRUARY 25, 2025**

Brandon Richard Wells appeals from the judgment of sentence, entered in the Court of Common Pleas of Venango County, following his convictions of one count each of first-degree murder,[1] drug delivery resulting in death (DDRD),[2] possession with intent to deliver (PWID)—marijuana,[3] criminal attempt—PWID—psilocybin,[4] abuse of a corpse,[5] possession of a controlled

---

[1] 18 Pa.C.S.A. § 2502(a).

[2] *Id.* at § 2506(a).

[3] 35 P.S. § 780-113(a)(30).

[4] 18 Pa.C.S.A. § 901(a).

[5] *Id.* at § 5510.

substance—marijuana,[6] possession of drug paraphernalia,[7] and three counts

of endangering welfare of children (EWOC).[8]  After review, we affirm.

The trial court[9] set forth the following factual summary:

This matter arises from the death of Brierlie Walters, who was
[Wells'] girlfriend and mother of his two children.  On the
afternoon of March 5, 2022, officers from the Oil City Police
Department (OCPD) were dispatched to [Wells'] residence at 12
Mineral Street in Oil city in response to a call reporting a deceased
woman.  Upon arrival, [Officer Thomas Schwab] encountered
[Wells] in front of the home.  [Wells] spoke with [Officer Schwab],
and when asked about the location of the victim, stated that she
was upstairs and that he had placed her corpse in a barrel.  [Wells]
explained that he had [placed her corpse in a barrel] so that the
children would not see her.  Upon entering the home and heading
upstairs to the master bedroom, [Officer Schwab] found the
victim's corpse in a blue, steel, 55-gallon drum.  Her corpse,
clothed only in a pair of socks and wearing a few pieces of jewelry,
had been inserted head-first in the drum and the drum had been
covered with a towel.  The officers detained [Wells], secured the
scene, and obtained a search warrant for the home.  Three
children[10] lived in the residence . . . [but] were not present at
the time[.]

_____

[6] 35 P.S. § 780-113(a)(16).

[7] *Id.* at § 780-113(a)(32).

[8] 18 Pa.C.S.A. § 4304(a)(1).

[9] The Honorable Marie Veon, then-President Judge of Venango County,
presided over this case until the end of December 2023, when she retired.
The case was reassigned to the Honorable Matthew Kirtland, who authored
the trial court opinion.

[10] Wells and the victim were the father and mother of the two younger
children.  The victim had the oldest child during a prior relationship.

* * *

During the search of the home, officers recovered packages of [] marijuana, equipment[,] and materials for the production of psilocybin mushrooms, packages of kratom,[11] and a Seroquel prescription bottle with a defaced label. The materials and equipment associated with psilocybin mushroom production were in areas accessible to the children, in [the] dining room and kitchen, as were the packages of kratom and a bottle of Seroquel. A tent was located in the master bedroom, where the victim's corpse was found, which contained materials used in the final stages of mushroom cultivation. With respect to the children, there was a toddler bed found in the living room, the children's bedroom was located upstairs, down the hall from the master bedroom, and some of the children's toys were found in the master bedroom.

With the aid of an appliance dolly taken from [Wells'] garage, several officers [were able to] remove[] the barrel containing the victim's body and transported it to the office of the Venango County Coroner, Christina Pugh. The victim weighed 202 pounds, and[,] while handcuffing [Wells], officers observed an apparent muscle injury in his [bicep], for which he later received medical treatment. The victim's body was removed from the barrel shortly after 9:00 [p.m.] and Coroner Rugh examined it, concluding that the victim had died approximately 12 hours earlier, during the morning of March 5, 2022. Coroner Rugh determined that an autopsy would be necessary to establish the cause of the victim's death.

Coroner Rugh transported the victim's corpse to the Erie County Coroner's office where Dr. Eric Vey, a forensic pathologist working out of the Erie County Coroner's office[,] performed [the] autopsy. D[octor] Vey testified that he found minor bruises and abrasions on the victim's legs[,] bruising on the right arm between the elbow and shoulder, and damage to her scalp consistent with having been dropped head-first into the drum, but no [] signs [of external] trauma that would have caused her death. Examination of her internal organs revealed no disease or other explanation for

---

[11] [11] "Kratom" commonly refers to an herbal substance that can produce opioid- and stimulant-like effects. *See* https://nida.nih.gov/research-topics/kratom (last visited 1/17/25).

her death. D[octor] Vey ordered a toxicology report. The toxicology report, [processed and generated by Dr. Kari Midthun at NMS Labs,] revealed the presence of several substances in the victim's blood[:] [n]icotine, caffeine, psilocin, buproprion, citalopram[, mitragynine (associated with the plant kratom), quietapine (Seroquel), alprazolam (Xanax), and carisoprodol (Soma). Doctor] Vey concluded that [nicotine, caffeine, psilocin, buproprion, and citalopram] were not contributors the victim's death. D[octor] Vey concluded that it was the combination of [mitragynine, quietapine, alprazolam, and carisoprodol] that resulted in the victim's death by combined drug toxicity. [He] testified that, at the levels found in the victim's blood, the combination of mitragynine and quietapine was itself potentially lethal, and that the combination of quietapine, alprazolam, and carisoprodol was potentially lethal.

After taking [Wells] into custody on the afternoon of March 5, 2022, the OCPD contacted Children and Youth Services for assistance in locating the children. Later that evening, the children were discovered at the home of Nestor Vasquez, a self-described friend of [Wells]. Along with the children, OCPD recovered a bag that [Wells] had sent with the children to Vasquez's home. The bag contained a box of instant mashed potatoes, books titled ["]Psilocybin Chef Cookbook["] and ["]Cooking with Magic: The Psilocybin Cookbook[,"] and mushroom spore prints, including psilocybin mushroom prints.

At trial, Vasquez testified regarding the sometimes-contentious relationship between [Wells] and the victim. Vasquez testified that [Wells] was displeased with the victim due to a custody dispute over the children. [Wells] indicat[ed to Vasquez, several times,] that [Wells] wished to kill the victim . . ., including as recently as three weeks prior to [the victim's] death[,] and that [Wells] had mentioned inducing a drug overdose as a possible method of killing the victim. Vasquez also testified that, on March 4, 2022, [Wells] had provided him with a drug-laced drink, [] which Vasquez believed to be coffee, [but which had] induced hallucinations[] and left him impaired.

Vasquez testified that, on the morning of March 5, 2022, [Wells] arrived at his home and informed him that the victim was dead and that [Wells] needed assistance in digging a bigger hole because he injured his arm lifting something. Vasquez declined to help[] and stated that he did not contact the police because he

was still intoxicated from the [drink Wells had given him] the night before. Vasquez heard from [Wells] again later that day, when [Wells] contacted him and informed him that he was bringing the [three] children to Vasquez's home "for a dead body." Vasquez also testified that he did not disclose many of these details to OCPD during his first interview as he was "confused and nervous," but that he did convey his full recollection of events at subsequent interviews.

Lieutenant [Cory] Ruditis of the OCPD [testified] regarding electronic records obtained from [Wells'] phone and Google accounts. This included a record of [Wells] watching a YouTube video titled "Paul Stamets Explains How to Grow Your Own Psilocybin Mushrooms at Envision Festival Costa Rica 2020," and a search for benzodiazepine.[12]

Kenneth Adamo, an inmate who shared a cell with [Wells] as he awaited trial, testified that [Wells] had been willing to offer his properties in exchange for [Adamo's] cooperation in facilitating Vasquez's death by overdose specifically, by befriending [Vasquez] as a "drinking buddy" and then contaminating his drink with fentanyl.

Trial Court Opinion, 4/26/24, at 1-5 (citations omitted).

Based upon the foregoing, the Commonwealth arrested Wells and charged him with the above-mentioned offenses. On August 8-14, 2023, Wells proceeded to a jury trial, after which he was found guilty as charged. The trial court deferred sentencing and ordered the preparation of a pre-sentence investigation report.

On September 19, 2023, the trial court conducted a sentencing hearing and sentenced Wells to life imprisonment for his first-degree murder conviction; 102 to 204 months' incarceration for DDRD; 16 to 32 months'

---

[12] The benzodiazepine class of drugs includes Xanax. **See** N.T. Jury Trial (Day 3), 8/10/23, at 132.

incarceration for PWID; 16 to 36 months' incarceration for criminal attempt—PWID—psilocybin; 12 to 24 months' incarceration for abuse of a corpse; 4 to 12 months' incarceration for possession of drug paraphernalia; and 12 to 36 months' incarceration for each of his EWOC convictions. The trial court imposed Wells' sentences for his first-degree murder, abuse of a corpse, and all three EWOC convictions consecutively to each other, and the remaining sentences concurrently. The trial court merged his possession of a controlled substance—marijuana conviction with his PWID—marijuana conviction. The foregoing results in an aggregate sentence of life imprisonment, followed by four to eleven years' incarceration.

On September 29, 2023, Wells filed a timely post-sentence motion, arguing the Commonwealth presented insufficient evidence, that his convictions of first-degree murder and DDRD should merge, and that his sentence was excessive. On January 30, 2024, the trial court denied Wells' post-sentence motion by operation of law. **See** Pa.R.Crim.P. 720(B)(3)(a).

Wells filed a timely notice of appeal and both he and the trial court have complied with Pa.R.A.P. 1925. Wells now raises the following claims for our review:

> [1.] The trial court erred when it ruled that [Wells'] expert, Karl E. Williams, MD, MPH could not testify as to his conclusion/opinion regarding the manner of death and/or that the death was accidental.
>
> [2.] The trial court erred in refusing to allow [Wells] to play video recordings of Commonwealth witness Vas[q]uez's first interview with police on cross[-]examination[ of Vasqeuz].

- 6 -

[3.] The evidence presented at trial was insufficient to convict [Wells] of the crime of [first-degree murder].

[4.] The evidence presented at trial was insufficient to convict [Wells] of [DDRD].

[5.] The evidence presented at trial was insufficient to convict [Wells] of [EWOC].

[6.] The evidence presented at trial was insufficient to show that [Wells] attempted to manufacture, deliver, or possess psilocybin.

[7.] The [trial] court should have merged Count 2, [DDRD,] with Count 1, [first-degree murder]. Both counts are based on the same alleged facts (poisoning) and thus merger is appropriate.

[8.] The sentence in this case was manifestly excessive and clearly unreasonable in that the [trial] court handed down sentences in the highest end of the standard range and made the sentences at Counts 1, 3, 4, 5, and 8 consecutive to each other, rather than running all of the sentences concurrently.

Brief for Appellant, at 7 (reordered for ease of disposition, unnecessary capitalization omitted).

In his first claim, Wells argues that the trial court erred in prohibiting his expert, Dr. Williams, from testifying regarding the victim's manner of death. *See* Brief for Appellant, at 27-28.

Wells' brief on this issue is woefully deficient and, consequently, we conclude that it is waived. Wells' argument section contains three paragraphs, with boilerplate citations to this Court's standard of review, and no citations to the record. *See* Pa.R.A.P. 2119(a) (providing appellant's arguments shall include "such discussion and citation of authorities as are deemed pertinent"); *Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) ("where an

- 7 -

appellate brief fails to . . . develop the issue in any [] meaningful fashion capable of review, that claim is waived"); ***Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007) (explaining appellant must "present arguments that are sufficiently developed for our review. . . . This Court will not act as counsel and will not develop arguments on behalf of an appellant."). Furthermore, Wells does not indicate where this claim was preserved in the trial court. ***See*** Pa.R.A.P. 2119(e) ("[w]here under applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth . . . either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating thereto as required by Pa.R.A.P. 2117(c)"). Accordingly, he has waived this claim for our review.

In his second claim, Wells argues that the trial court erred in prohibiting him from playing the video recordings of Vasquez's first police interview. ***See*** Brief for Appellant, at 28-31. Wells acknowledges that he was permitted to use the transcript of Vasquez's first interview to impeach Vasquez at trial, but nevertheless argues that the actual video should have been permitted to "show the general atmosphere of the interview itself, which would not be clear using only the transcripts." ***Id.*** at 29. Wells further contends that under the best evidence rule, Pa.R.E. 1002, videotapes are preferable to testimony about contents of that video. ***See id.*** at 30-31.

We conclude that Wells has waived this challenge. In his Rule 1925(b) concise statement, Wells does not state which rule or rules of evidence the

- 8 -

trial court purportedly violated. We observe that Wells now raises, for the first time, a challenge under the best evidence rule, which he has waived for failing to include it in his Rule 1925(b) concise statement. *See* Brief for Appellant, at 30-31; Statement of Matters Complained of on Appeal, 2/20/24, at 1-4 (unpaginated); Trial Court Opinion, 4/26/24, at 20 n.46 (noting Wells had not raised best evidence rule in Rule 1925(b) statement); *see also* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the [s]tatement . . . are waived."); Pa.R.A.P. 302(a) ("[I]ssues not raised in the [trial] court are waived and cannot be raised for the first time on appeal."). Thus, we conclude that Wells' failure to identify what rule of evidence he relies upon, in his Rule 1925(b) concise statement, necessitates waiver. *See* Pa.R.A.P. 2119(a) (providing appellant's arguments shall include "such discussion and citation of authorities as are deemed pertinent"); *Johnson*, *supra*; *Hardy*, *supra*; *see also* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the [s]tatement . . . are waived."). Accordingly, Wells has waived this claim for our review.

Wells' next four claims[13] challenge the sufficiency of the evidence, for which we adhere to the following standard of review:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence

---

[13] We note with displeasure that Wells addresses these four challenges together in a mere five pages of his argument section, with no citations to the record and sparse citations to statutes and case law. *See* Brief for Appellant, at 22-27; *see also* Pa.R.A.P. 2119(a) (providing appellant's arguments shall include "such discussion and citation of authorities as are deemed pertinent"). Nevertheless, we conclude that Wells has not waived these challenges because this Court is able to discern which elements of each offense he has challenged.

to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not [re-]weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated[,] and all evidence actually received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Smith*, 97 A.3d 782, 790 (Pa. Super. 2014) (citation omitted).

In addressing these claims, we rely upon the trial court opinion and, thus, we address them together. Wells argues that the Commonwealth presented insufficient evidence to sustain his convictions of first-degree murder, DDRD, EWOC, and criminal attempt—PWID—psilocybin. *See* Brief for Appellant, at 22-27. Regarding his convictions of first-degree murder and DDRD, Wells asserts that the Commonwealth failed to demonstrate that Wells had provided, or forced the victim to take the drugs that resulted in her death. *See id.* at 24-25. Regarding his EWOC convictions, Wells contends that the Commonwealth failed to present any evidence that there were items dangerous to the children within the house and that mere possession of these innocent items is insufficient to demonstrate that the children's physical or psychological welfare was threatened. *See id.* at 25-26. Regarding his

- 10 -

criminal attempt—PWID—psilocybin conviction, Wells posits that the Commonwealth failed to demonstrate that he actually delivered, manufactured, or possessed psilocybin. *See id.* at 26-27. Wells avers that psilocybin spores, which he alleges do not contain the psychoactive compound psilocybin, are not controlled substances and, thus, mere possession of them cannot sustain his PWID conviction. *See id.* We disagree with each of these arguments.

The Crimes Code states "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a). An intentional killing is a "[k]illing by means of **poison**, or by lying in wait, or by any other kind of willful, deliberate[,] and premeditated killing." *Id.* at § 2502(d) (emphasis added). In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and the specific intent to kill. *Commonwealth v. Le*, 208 A.3d 960, 969 (Pa. 2019). Furthermore, the law does not require a lengthy period of premeditation. Indeed, "the period of reflection required for premeditation to establish the specific intent to kill . . . can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." *Commonwealth v. Rivera*, 983 A.2d 1211, 1220 (Pa. 2009).

The Crimes Code states that a person commits DDRD if the person "intentionally administers, dispenses, delivers, gives, prescribes, sells[,] or

distributes any controlled substance or counterfeit controlled substance in violation of section 13(a)(14) or (30) of the . . . Controlled Substance, Drug, Device[,] and Cosmetic Act, and another person dies as a result of using the substance." 18 Pa.C.S.A. § 2506(a). The crime of DDRD "consists of two principle elements: (i) intentionally administering, dispensing, delivering, giving, prescribing, selling[,] or distributing any controlled substance or counterfeit controlled substance[,] and (ii) death caused by [] the use of that drug." *Commonwealth v. Kakhankham*, 132 A.3d 986, 991-92 (Pa. Super. 2015) (quotation marks omitted). This Court has previously stated:

> [T]he applicable *mens rea* for the crime of [DDRD] is two-fold. First, the delivery, distribution or sale of the contraband must be intentional. [*Id.* at 992.] Second[,] the actual death must be the reckless result of the actions of the defendant. *Id.* at 995. As such, the crime is an intentional act in providing contraband, with a reckless disregard of death from the use of the contraband.

*Commonwealth v. Carr*, 227 A.3d 11, 16-17 (Pa. Super. 2020).

The Crimes Code states that a person commits the crime of EWOC when that person is "a parent, guardian[,] or other person supervising the welfare of a child under 18 years of age . . . [and] knowingly endangers the welfare of the child by violating a duty of care, protection[,] or support." 18 Pa.C.S.A. § 4304(a)(1). EWOC "is a specific intent offense which was enacted in broad terms to safeguard the welfare and security of children." *Commonwealth v. Fewell*, 654 A.2d 1109, 1117 (Pa. Super. 1995) (citation omitted). To be convicted under this statute, the Commonwealth must prove a "knowing

- 12 -

violation of a duty of care." **Id.** (quoting **Commonwealth v. Cardwell**, 515 A.2d 311, 313 (Pa. Super. 1986)).

Lastly, a person commits criminal intent when, "with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. 901(a). Therefore, "in the attempt setting, the *mens rea* level of intentionally attaches to the result[.]" **Commonwealth v. Roebuck**, 32 A.3d 613, 622 (Pa. 2011). The result in question here is PWID—psilocybin, which is defined as "the **manufacture**, delivery, or possession with intent to deliver, a controlled substance by a person not registered under this act . . . or knowingly creating, delivering[,] or possessing with intent to deliver, a counterfeit controlled substance" is prohibited. 35 P.S. § 780-113(a)(30) (emphasis added); **see also id.** at § 780-104(1)(iii) (providing "any material, compound, mixture, or preparation which contains any quantity of the following hallucinogenic substances, their salts, isomers, and salts of isomers, unless specifically excepted, whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation: . . . 14. [p]silocybin[.]").

Instantly, the trial court addressed Wells' sufficiency claims as follows:

### [First-Degree Murder] and DDRD

[Wells] raises the same evidentiary challenge for both his [] murder and DDRD convictions: that the evidence was insufficient to show that [Wells] provided the victim with any of the drugs that caused her death.

* * *

- 13 -

The combination of substances that caused the victim's death was: mitragynine (kratom), quietapine (Seroquel), alprazolam (Xanax), and carisoprodol (Soma). The testimony of Dr. Vey, the forensic pathologist, was that one of two possible combinations of the drugs in the victim's blood, in the quantities observed, was [] most likely responsible for her death: the combinations of mitragynine and quietapine, [or] the combination of quietapine, alprazolam, and carisoprodol. As there was no direct evidence that [Wells] administered any of these substances to the victim[;] the question here is whether the circumstantial evidence presented [at] trial . . . was enough to permit the jury to [conclude] that [Wells] did provide the victim with the drugs that caused her death. Put differently, there must be some set of facts here that would permit the jury to reasonably infer, without engaging in mere conjecture, that [Wells] provide[d] these substances to the victim.

A prescription bottle of Seroquel, and several packages of kratom were recovered in [Wells'] home following the victim's death. [Wells] did not simply call the police after the victim's death, but instead dropped her corpse into a [55-gallon ]barrel head[-]first, injuring himself in the process, before contacting police approximately 12 hours later. Vasquez, [Wells'] friend, testified that [Wells] was displeased with the victim due to a custody dispute over their children, that [Wells] had said that he wished to kill the victim, and that [Wells] had mentioned inducing a drug overdose as a possible method of killing the victim. Vasquez further testified that [Wells] had [] surreptitiously dosed him with a hallucinogen by providing him with a drink which Vasquez had believed to be ordinary coffee. Adamo, a man incarcerated with [Wells] pending trial, testified that [Wells] suggested to him that he gain Vasquez's confidence and then kill [Vasquez] by contaminating a drink with fentanyl, and told Adamo that he would give him properties in exchange, after [Wells] had become aware that Vasquez may be a witness against him. The credibility of these witnesses and the weight of their testimony were for the jury to determine and jury returned a guilty verdict.

The circumstantial evidence that [Wells] . . . provide[d] the victim [with] the substances that ended her life was more than sufficient for the jury to reasonably infer as much without engaging in mere conjecture.

**[EWOC Convictions]**

The crux of [Wells'] complaint here is that the evidence was insufficient to establish that the three children were placed in any danger by the materials found in his home, because there was no evidence that such materials were dangerous to children had they been exposed to those materials. This argument fails, both because exposure to the products of [Wells'] grow operation presented a risk of harm, and because the operation itself was a risk to the well-being of the children, even if every individual component of it, when viewed in isolation, [was potentially] harmless.

* * *

[Wells] did not simply possess controlled substances, but rather had attempted to manufacture them, and did not keep everything locked away from or inaccessible to the children. The materials used in conjunction with the production of psilocybin mushrooms were generally in areas that were freely accessible to the children. Parts of [Wells'] psilocybin mushroom grow operation were in various rooms throughout the house, most or all of which were accessible to the children. This includes the padlocked master bedroom—while the padlock on the exterior of the bedroom door could most certainly prevent children from intruding there, the presence of children's toys on the bedroom floor suffice to allow the jury to make the reasonable inference that the children had access to the master bedroom. [Wells'] focus on whether any materials themselves posed risk of harm to the children is misplaced. Even if it were not, the fact that [Wells] had a hallucinogenic-mushroom grow operation in areas accessible to the children shows a clear disregard for the hazards posed to children by such mushrooms. The evidence here is sufficient for the jury to infer that, had [Wells'] operation continued unimpeded, psilocybin mushrooms would have been present in areas accessible to the children, and given the ages of the children and similarity between psilocybin mushrooms and ordinary edible mushrooms—which, based upon the evidence, [Wells] was also growing—presented a clear risk of harm[.] Attempting to grow psilocybin mushrooms in a home shared with small children, in areas accessible to them, is the type of parental conduct apt to offend the common sense of the community and the sense of decency, propriety[,] and the morality which most people entertain. The evidence regarding [Wells'] books and research

- 15 -

would allow the jury to reasonably infer that [Wells] is well-aware of the properties of such mushrooms, and[,] thus[,] would be aware of the danger posed by growing them in an area accessible to small children. . . . As previously noted, [Wells] had pieces of his grow operation all over the home in which the children lived. In addition, [Wells] sent the children to Vasquez's home with psilocybin spores.

Furthermore, the risk to the children was not confined to the psilocybin grow operation, but also included the large quantities of marijuana found in the home, specifically in the master bedroom. [Again, t]he presence of the children's toys in the master bedroom permits the jury to reasonably infer that the children had access to the room in which the marijuana was stored. This is not a case of mere possession in an area that was inaccessible to the children.

The evidence regarding the distribution of [Wells'] grow operation throughout his home, taken together with the evidence regarding the marijuana and of [Wells'] decision to send his children to Vasquez's home with materials connected to the growth of psilocybin mushrooms, [and the spores themselves,] are sufficient to support [the EWOC convictions.]

**Attempt to Manufacture Psilocybin Mushrooms**

[Wells'] final challenge to the sufficiency of the evidence is that the evidence was insufficient "to show that [Wells] manufactured, delivered, or possessed psilocybin." However, that was not the charge for which [he] was convicted with respect to the psilocybin mushrooms[. Wells] was charged with [] **criminal attempt** to manufacture the mushrooms. It is not necessary for [Wells] to have actually manufactured or possessed the mushrooms to sustain a conviction for an attempt to do so. [Nevertheless, the trial court] assume[s] that [Wells] intends to argue that the evidence was insufficient to show an **attempt** to manufacture psilocybin mushrooms.

* * *

The Commonwealth offered evidence that the following were observed in [Wells'] home: pre-made mixtures for growing liquid mushroom cultures; plastic syringes with a "shroom supplies" label; mushroom growing bags; beakers; nitrile gloves and

- 16 -

isopropyl alcohol; an air filtration system; a magnetic stirrer; jars of liquid mushroom culture; a large box ventilated to the outside of [Wells'] home of the sort that was usable in the final stages of mushroom growth; and inoculated agar plates labeled "ATL No. 7, A Strain 1, A Strain 2, Azure, and Cyan." Officers also recovered a spore print labeled "psilocybin mushroom prints" from a bag that [Wells] had sent with his children to [] Vasquez's home while he moved the victim's body. In addition, the following books were found in [Wells'] home: Psychedelic Chemistry, Psilocybin Mushroom Handbook, Psilocybin Mushroom Bible, Magic Mushroom Groomer's Guide, and Psilocybin Mushrooms of the World. Two more books of a similar character were recovered from the bag that [Wells] sent with the children to [] Vasquez's home: Psilocybin Chef Cookbook, and Cooking with Magic: The Psilocybin Cookbook.

Much of the equipment and many of the materials are consistent with a perfectly legal amateur mycology or fungiculture hobby, and it appears that [Wells] as also growing ordinary mushrooms commonly used for food. Furthermore, [Wells] points out, correctly, that the inoculated agar plates were not tested for the presence of psilocybin spores, and that the presence of psilocybin spores was not confirmed by other means. However, the existence of an innocent explanation for some or perhaps most of the equipment and materials found at [Wells'] home does not render the evidence that he intended to grow, and took a substantial step toward growing, psilocybin mushrooms sufficiently weak an[d] inconclusive that a jury could not [] make the reasonable inference that [Wells] was making an effort to grow psilocybin mushrooms. The forensic scientist who conducted testing on the substances found in [Wells'] home testified that, in his experience ,the names of the strains, appearing on the labels of the agar plates, were consistent with psilocybin mushrooms. While the forensic scientist's testimony as to the names on the agar plates is by no means conclusive, the jury did not hear that in isolation, and it was up to them to determine the weight of that testimony. [Wells] had psilocybin spores, numerous guides pertaining to psilocybin mushrooms, the equipment and materials necessary to grow psilocybin mushrooms, and inoculated agar plates. Given the evidence, the jury did not need to rely solely upon suspicion or conjecture to determine that [Wells] both intended to grow psilocybin mushrooms and took a substantial step toward growing them. [Wells'] sufficient of the evidence [claim] on this matter lacks merit.

Trial Court Opinion, 4/26/24, at 12-19 (citations omitted, emphasis in original).

Based upon our review of the record, we agree with the trial court's thorough analysis and conclusions.[14] *See id.*; *see also Smith*, *supra*. Accordingly, we conclude that Wells' sufficiency claims lack merit.

In his seventh claim, Wells argues that the trial court imposed an illegal sentence when it failed to merge his convictions of DDRD and first-degree

---

[14] As it relates to Wells' convictions of first-degree murder and DDRD, we observe, in addition to the facts set forth by the trial court, that Wells asked Vasquez to help him bury the victim's body. *See* N.T. Jury Trial (Day 2), 8/9/23, at 117-21. Additionally, the Commonwealth demonstrated via circumstantial evidence that Wells' arm was injured because he hauled the 55-gallon steel drum from his garage, up the stairs, and into the master bedroom, where he forced the victim's 202-pound corpse into the barrel. *See* N.T. Jury Trial (Day 1), 8/8/23, at 108-18 (Wells had obvious injury to his arm, requiring handcuffs be placed in front of his body, and was taken to hospital for treatment); *id.* at (Day 1), 8/8/23, at 105, 150-51 (two officers and an appliance dolly, located in Wells' garage near similarly-sized drums, were needed to remove 55-gallon steel drum containing victim's corpse from house); *id.* at (Day 2), 8/9/23, at 120 (Wells telling Vasquez that he injured his arm "lifting something" and needed help digging "bigger hole" for victim's body). Wells' statements to police that he hid the victim's body to keep it out of sight of the children are self-serving and, when coupled with his significant delay in calling the police, demonstrate his consciousness of guilt. *See Commonwealth v. Markman*, 916 A.2d 586 (Pa. 2007) (efforts to conceal victim's body can constitute circumstantial proof of consciousness of guilt); *Commonwealth v. Gonzalez*, 858 A.2d 1219, 1223 (Pa. Super. 2004) (actions that demonstrate attempt to conceal crime or destroy evidence are admissible to prove malice in first-degree murder case and to show consciousness of guilt). Furthermore, the Commonwealth presented evidence that Wells had been mixing the victim's morning tea with psilocybin on some days leading up to the murder. *See* N.T. Jury Trial (Day 2), 8/9/23, at 144-45. All of the evidence, taken together and viewed in the light most favorable to the Commonwealth, was sufficient to prove that Wells had intentionally killed the victim by poisoning. *See Smith*, *supra*.

murder. *See* Brief for Appellant, at 21-22. Wells contends that his DDRD and first-degree murder convictions are based upon the same set of facts, the poisoning of Walters, and that all the elements of both crimes are the same. *See id.* We disagree.

Our standard of review is well-settled. "A claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence. Therefore, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Quintua*, 56 A.3d 399, 400 (Pa. Super. 2012). Merger of sentences is generally governed by section 9765 of the Sentencing Code, which provides:

> **§ 9765. Merger of sentences**
>
> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765.

We summarized the elements of both DDRD and first-degree murder above and, thus, we do not do so again. It is sufficient to say that first-degree murder requires malice and a specific intent to kill. *See* 18 Pa.C.S.A. § 2502(a); *Le*, *supra*. However, the only "intentional" requirement of DDRD is the **delivery of the drug** that kills the victim. *See* 18 Pa.C.S.A. § 2506. The *mens rea* requirement for the killing in DDRD is **recklessness**. *See Carr*, *supra*. Moreover, DDRD's requirement of an intentional and unlawful provision of a controlled substance or counterfeit controlled substance to

- 19 -

another person is **not** an element of first-degree murder. These distinctions foreclose merger of these two crimes. *See* 42 Pa.C.S.A. § 9765. Accordingly, Wells is entitled to no relief on this claim.

In his eighth claim, Wells challenges the discretionary aspects of his sentence, from which there is no automatic right to appeal. *See Commonwealth v. Austin*, 66 A.3d 798, 807-08 (Pa. Super. 2013). Rather, when an appellant challenges the discretionary aspects of his sentence, we must consider his brief on this issue as a petition for permission to appeal. *Commonwealth v. Yanoff*, 690 A.2d 260, 267 (Pa. Super. 1997). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (quotation marks and some citations omitted).

Here, Wells has filed a timely notice of appeal, a post-sentence motion, and properly included a Rule 2119(f) statement in his brief. We next consider whether he has raised a substantial question for our review.

Whether a particular issue constitutes a substantial question about the appropriateness of the sentence is a question to be evaluated on a case-by-case basis. *See Commonwealth v. Kenner*, 784 A.2d 808, 811 (Pa. Super.

2001). This Court does not accept bald assertions of sentencing errors. *See Commonwealth v. Malovich*, 903 A.2d 1247, 1252 (Pa. Super. 2006). Rather, an appellant must show actions by the trial court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process. *See Commonwealth v. Ferguson*, 893 A.2d 735, 737 (Pa. Super. 2006).

Wells argues that he has raised a substantial question where his sentence of life imprisonment, followed by four to eleven years incarceration, is excessive. *See* Brief for Appellant, at 17-18. Additionally, Wells asserts that the trial court abused its discretion in imposing his standard-range sentences consecutively instead of concurrently. *See id.*

"Generally, Pennsylvania law affords the sentencing court discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed. Any challenge to the exercise of this discretion ordinarily does not raise a substantial question." *Commonwealth v. Prisk*, 13 A.3d 526, 533 (Pa. Super. 2011) (citation and quotation marks omitted); *see also Commonwealth v. Hoag*, 665 A.2d 1212, 1214 (Pa. Super. 1995) (defendant is not entitled to "volume discount" for his crimes by having all sentences run concurrently). However, a claim that an aggregate sentence resulting from the imposition of consecutive sentences is excessive raises a substantial question if the "decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the

case." **Commonwealth v. Dodge**, 77 A.3d 1263, 1273 (Pa. Super. 2013). "Thus, in our view, the key to resolving the preliminary substantial question inquiry is whether the decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the case." **Prisk**, 13 A.3d at 533 (quotation omitted).

Instantly, we conclude that Wells' claim of an "excessive sentence" that was imposed consecutively instead of concurrently does not raise a substantial question. **See Prisk**, **supra**. We observe that the criminal conduct at issue includes first-degree murder, which carries a mandatory sentence of life imprisonment. **See** 18 Pa.C.S.A. § 1102(a) (first-degree murder conviction requires sentence to either life imprisonment or death); 42 Pa.C.S.A. § 9711(a)(1) (relating to sentencing procedure and stating first-degree murder conviction requires sentence to either life imprisonment or death). Thus, Wells' remaining aggregate sentence of four to eleven years' incarceration does not appear, upon its face, to be excessive in light of the criminal conduct at issue. **See Dodge**, **supra**; **Prisk**, **supra**. Accordingly, we conclude that Wells has failed to raise a substantial question for our review, and we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 2/25/2025